

**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY

MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
(973) 645-6340

**WILLIAM J. MARTINI**
     **JUDGE**

# LETTER OPINION

December 2, 2008

Kathleen Beety-Monticelli
20 Augusta Street
Elmwood Park, NJ 07407
(*Plaintiff* pro se)

Kimberly L. Schiro
Office of the General Counsel
Social Security Administration
26 Federal Plaza
Room 3904
New York, NY 10278

Ellen E. Sovern
Office of the United States Attorney
26 Federal Plaza
Room 3904
New York, NY 10278
(*Attorneys for Defendant Commissioner of Social Security*)

    Re:   <u>**Beety-Monticello v. Commissioner of Social Security**
           **Civil Action No. 2:06-CV-05926 (WJM)**</u>

Dear Litigants:

    Plaintiff Kathleen Beety-Monticelli brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of a final determination by the Commissioner of Social Security ("Commissioner") denying Monticelli's application for Social Security Disability Insurance Benefits ("DIB") and Child's Insurance Benefits ("CIB"). Pursuant to

Fed. R. Civ. P. 78, the Court did not hold oral argument. For the following reasons, the Commissioner's decision is **AFFIRMED**.

## BACKGROUND AND PROCEDURAL HISTORY

Monticelli was born on November 18, 1977 and is currently 31 years of age. (R. 443.) She last worked in 2002 as a fast food restaurant cashier, where she spent considerable time on her feet. (R. 444.) From approximately 1993-1995 and again from 1996-1998, Monticelli worked in day care, where she lifted and carried toys, chairs, and children between ten and twenty pounds. (R. 445-46.) She alleges that she has been disabled since May 9, 1996 due a blood clotting disorder. (R. 447.)

Monticelli filed for DIB on November 15, 2002 and CIB on February 27, 2003. These claims were denied initially and upon reconsideration. (R. 40-43, 413, 416-18.) Pursuant to Monticelli's request, an administrative hearing was held before Administrative Law Judge ("ALJ") Christopher P. Lee on February 22, 2005, who issued a decision finding that Monticelli was not disabled. (R. 13-21.) The Appeals Council affirmed the ALJ's decision on October 12, 2006, and Monticelli's review of that affirmance is presently before the Court. (R. 4-7.)

Monticelli claims that she has suffered from disabling outbursts of deep vein thrombosis ("DVT") and pulmonary emboli, since the age of 16, as a result of a Factor V Leiden deficiency. (R. 317.) Laboratory results from March and April 1997 show elevated prothrombin times, (R. 229-35), and laboratory results from July 8, 1999 indicate that Monticelli suffers from a Factor V Leiden deficiency, (R. 219). After complaints of left leg pain, a venous doppler conducted on July 12, 1999 failed to reveal DVT, but instead deep vein insufficiency. (R. 213.) Moreover, a CT scan of Monticelli's chest on August 31, 1999 revealed "no evidence of pulmonary embolus." (R. 209.)

Between 2000 and 2003, Monticelli received medical care from hematologists Dr. Richard Rosenbluth and Dr. Andrew Jennis. In an initial evaluation, on October 16, 2000, Dr. Rosenbluth noted that Monticelli suffered from DVT in the past, as well as her diagnosis of Factor V Leiden. (R. 187.) He also noted that Monticelli stopped taking blood thinners during her pregnancy in 1996, which resulted in a pulmonary embolism shortly after delivery. (*Id.*) Dr. Rosenbluth determined that Monticelli was a "[p]atient with a possible hypercoagulable state" resulting from a Factor V Leiden mutation. (R. 188.) He ordered blood work and re-started Monticelli on an anticoagulant, specifically Lovenox. (R. 188-89.) On December 28, 2000, during a visit with Dr. Jennis, Monticelli again complained of left leg pain, which Dr. Jennis believed to be "DVT of the left calf." Concerned, he ordered a venous doppler to confirm. (R. 190-91.)

After periodic visits through March 2002, Drs. Rosenbluth and Jennis noted that Monticelli was "doing well," that there was no evidence of new clots, bleeding, or bruising. (R. 166-84.) During this time, Monticelli switched between two blood thinners, Coumadin and Lovenox at various dosages, in an effort to regulate her prothrombin time. (*Id.*)

However, in October 2002, Monticelli developed a new clot and she informed Dr. Rosenbluth that she wanted to be placed on disability. (R. 164.) Even though Dr. Rosenbluth stated on October 2, 2002 that she was "doing well," he penned a letter on October 25, 2002 opining that Monticelli "remains medically disabled until January 1st, 2003." (R. 357.) In an undated Physician Certification, presumably dated November 25, 2002, Dr. Rosenbluth noted that Monticelli was taking Vioxx and also that her "chronic and acute DVT's in lower extremities makes walking very difficult."[1] (R 360.)

Following Monticelli's request for disability, Dr. Rosenbluth referred Monticelli to Dr. Gary Schwartz, who took over her primary care starting on November 6, 2002. (R. 165.) Much like Dr. Rosenbluth, Dr. Schwartz diagnosed Monticelli with a hypercoagulable state, as stated in a Federal Disability Specialist Form report dated April 29, 2003. (R. 162.) The questionnaire noted that Monticelli visited the hospital on February 9, 2003 after she complained about pain in her legs. (R. 162.) She was treated and released from the emergency room. A venous doppler tested positive for DVT and superficial venous thrombosis in the left leg. (R. 162-63.) Dr. Schwartz also opined that Monticelli's obesity and tendency to clot limited her ability to perform certain activities such as standing and walking for prolonged periods of time. (R. 162.)

Monticelli underwent a consultative examination by Dr. Alan Plauka on July 29, 2003. (R. 295-98.) Monticelli reported to Dr. Plauka that she could still perform chores, such as cooking, cleaning, and laundry, and could still shower, bathe, and dress herself. (R. 295.) Since she had difficulty standing for long periods of time, however, Monticelli needed help shopping. (R. 295.)

---

[1] The Court finds that the Physician Certification was presumably dated November 25, 2002 based on a note appearing near the top margin of the first page, which states "Gave to Pt. 11/25 Front desk." (R. 359.) The handwriting of the note on the top margin matches the handwriting found in the rest of the document. In addition, the dates of the last three visits are November 19, 2002, October 8, 2002, and October 2, 2002. (*Id.*) The document is signed by Dr. Rosenbluth. The date of this document does not effect the administrative review, because it concerns Monticelli's health after the relevant time period, i.e., June 30, 1998 for DIB purposes and November 19, 1999 for CIB purposes. *See Manzo v. Sullivan*, 784 F. Supp. 1152, 1156 (D.N.J. 1991).

After an examination, Dr. Plauka determined that Monticelli was not in acute distress. (R. 296.)  Her gait was normal. (*Id.*)  She could walk on her heels, but not on her toes. (*Id.*)  She could only perform a partial squat due to her left leg pain. (*Id.*)  Her stance was normal and she used no assistive devices. (*Id.*)  Monticello did not need help changing for the exam or getting on and off the exam table and she could rise from a chair without difficulty. (*Id.*)

With regards to Monticelli's musculoskeleton, Dr. Plauka found that the cervical spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally. (R 297.)  She did not have scoliosis, kyphosis, or abnormality in the thoracic spine. (*Id.*)  Her lumbar spine showed flexion 0º to 80º, normal lateral flexion and bilateral rotary movements.  Straight leg raising was negative bilaterally. (*Id.*)  She has full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*)  She also had full range of motion of her hips, knees and ankles bilaterally. (*Id.*)  Strength was 5/5 in the left upper extremity and right lower extremity, while only 4/5 in the right upper extremity and left lower extremity. (*Id.*)  Dr. Plauka found no evidence of subluxations, contractures, ankylosis, or thickening. (*Id.*)  Her joints were stable and non-tender and there was no redness, heat, swelling, or effusion. (*Id.*)  He also did not note any motor or sensory deficits. (*Id.*)

Monticelli's lower extremities showed no cyanosis or clubbing, but did show a 1+ pitting edema in the left leg up to the knee. (*Id.*)  She also had trace pitting edema in the right leg up to the knee.  Her pulse was physiologic and equal and there were no significant varicosities, tropic changes, or muscle atrophy. (*Id.*)

Dr. Plauka diagnosed Monticelli with: (1) a history of Factor V Leiden mutation; (2) chronic pain and swelling of the left leg; and (3) right shoulder and upper back pain. (*Id.*)  His prognosis was fair, and found that Monticelli was "mildly to moderately limited for prolonged standing and walking due to left leg pain." (*Id.*)

Dr. Schwartz also completed a Multiple Impairments Questionnaire at Monticelli's request on January 24, 2004. (R. 305.)  In this questionnaire, he indicated that he last saw Monticelli on February 12, 2003 and that he diagnosed her with hypercoagulable state, chronic DVT, pulmonary embolism, and Factor V Leiden mutation. (*Id.*)  He re-stated that Monticelli could only stand and walk for a period of zero to one hour during an eight hour day. (R. 306.)  Dr. Schwartz opined that Monticelli should not sit or stand/walk continuously during the day and that she could not lift any amount of weight. (R. 307-08.)  He stated that these limitations existed since 1995. (R. 311.)

On November 22, 2004, Monticelli again returned to Dr. Rosenbluth because she wanted to switch blood thinners from Lovenox to Heparin. (R. 315.) Even though Monticelli only took Lovenox twice a day, her medical state remained "unchanged from the prior visit and recorded in the original note." (*Id.*) Since Monticelli refused to continue taking Lovenox, Dr. Rosenbluth proscribed her Heparin. Following the switch, Monticelli returned on December 3, 2004 complaining of pain in her right groin. (R .321.) Suspecting another blood clot, Dr. Rosenbluth ordered another venous doppler and informed Monticelli that she must go back on Lovenox. (R. 322.) He also noted that Monticelli's hypercoagulable state is progressive, meaning that it is increasing in scope and severity. (*Id.*) During a follow-up visit on December 10, 2004, after Monticelli switched back to Lovenox, Dr. Rosenbluth noted that "[s]he's back on it and feels better" and that she is "doing well." (R. 314-15.)

In a decision dated February 22, 2005, the ALJ Lee engaged in a detailed analysis which addressed the five-step sequential process found in 20 C.F.R. § 404.1520(a)(4)(i)-(v). The ALJ found that Monticelli had a severe blood clotting disorder, which did not satisfy the requirements of an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix I (Listings). (R. 17-18.) Additionally, the ALJ found that despite Monticelli's impairment, she retained the residual functional capacity ("RFC") to perform work which would not require lifting heavy objects or exposure to activities which could result in bruising or cutting. (R. 19.) Based upon this RFC, the ALJ concluded that Monticelli could return to her past work as a fast food restaurant cashier. (R. 19-20.) He also concluded that Monticelli was not disabled prior to the expiration of her disability insured stated on June 30, 1999, or the attainment of age twenty-two on November 18, 1999 in accordance with 20 C.F.R. § 404.1520(f).

## **STANDARD OF REVIEW**

The district court reviews the factual findings of the Commissioner to determine whether they are supported by substantial evidence. *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). When substantial evidence upon which the ALJ can base his factual findings exists, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S. § 405(g)). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Under the substantial evidence standard, the district court is required to review the record as a whole. *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). If there is more than one rational interpretation of the evidence in the record, this Court must accept the conclusions of the ALJ and affirm the

decision. *See Izzo v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 280, 284 (3d Cir. 2006) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court is "not permitted to weigh the evidence or substitute [its] own conclusions for that of the fact-finder." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)). Overall, the substantial evidence standard is a deferential standard of review, which requires deference to inferences drawn by the ALJ from the facts, if they are supported by substantial evidence. *Schaudeck*, 181 F.3d at 431.

## DISCUSSION

Monticelli contends that the ALJ's decision should be reversed because the decision lacks the support of substantial evidence.[2] Monticelli also submitted additional medical records to the United States Attorneys Office on July 9, 2008, requiring the Court to determine whether remand is warranted.

### A.   Disability Evaluation Process

An individual may be entitled to Social Security benefits upon a finding of disability by demonstrating an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). A disabling impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). An individual is only considered to be disabled if the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The ALJ must demonstrate the relevant evidence used to deny a claimant's disability benefit is such that a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

In determining whether an individual is disabled, the Social Security Administration has established a five-step evaluation process. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d

---

[2] In specific, she states: "All I ask is for you to read my medical records and base my disability on the facts. . . . I am asking you to weight this decision based upon my medical records . . . . If you read my files of medical records, that will prove, that in fact I am disabled since 16." (Pl. Br. 5-6.)

6

Cir. 2004); *see* 20 C.F.R. § 404.1520. Under step one, the Commissioner determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). For step two, the Commissioner considers the medical severity of the claimant's impairments. If the claimant suffers from a "severe" impairment, the Commissioner proceeds to step three. 20 C.F.R. § 404.1520(a)(4)(ii). Under step three, if the claimant suffers from an severe impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix I (Listings) or its medical equivalent then the claimant is automatically classified as disabled. 20 C.F.R. §§ 404.1520(a) (4)(iii), 404.1520(d), 404.1520(e).

However, if the claimant does not automatically qualify, then under step four, the Commissioner analyzes whether the claimant retained the RFC to perform past relevant work. If the claimant retained RFC, he or she cannot receive disability benefits. 20 C.F.R. § 404.1520(a)(4)(iv). Even if the claimant lacks the RFC to perform past relevant work, under step five, the Commissioner determines whether the claimant can perform other work that exists in significant numbers in the national economy–given the claimant's medical impairments, age, education, past work experience, and RFC. If the claimant can perform such other work, he or she fails to qualify for benefits. 20 C.F. R. § 404.1520(a)(4)(v).

The claimant bears the burden to prove the first four factors. Once the claimant demonstrates and inability to perform past relevant work, the burden shifts to the Commissioner "to prove that there is some other kind of substantial gainful employment he is able to perform." *Kangas*, 823 F.2d at 777.

**A.      The ALJ's Decision is Supported by Substantial Evidence**

The record contains substantial evidence to support the ALJ's findings. To receive disability insurance benefits pursuant to Title II of the Social Security Act, claimants bear the burden of showing that they were insured under the program at the time of onset of disability. *Kane v. Heckler*, 776 F.2d 1130, 1131 n.1 (3d Cir. 1985). Likewise, to receive child's insurance benefits, claimants must show that they had a disability that began prior to their respective twenty-second birthday. *Walter v. Halter*, 243 F.3d 703, 705 (3d Cir. 2001); *see* 20 C.F.R. § 404.350. Evidence that an impairment became disabling after the expiration of the individual's insured status does not entitle the individual to disability insurance benefits, even though the impairment may have existed before the individual's insured status expired. *Manzo v. Sullivan*, 784 F. Supp. 1152, 1156 (D.N.J. 1991); *Jackson v. Heckler*, 580 F. Supp. 1077, 1078-79 (E.D. Pa. 1984). To qualify for benefits, Monticelli must prove, by substantial evidence, the she was disabled before June 30, 1998 for DIB purposes and before November 18, 1999, her twenty-second birthday, for CIB purposes.

7

The record establishes that Monticelli was not engaged in "substantial gainful activity" after May 9, 1996, the alleged onset date. As stated by the ALJ, social security computerized records indicate that Monticelli earned $5,642.58 in 2000, (R. 17), well below the $700 per month ordinarily considered indicative of substantial gainful activity. *See* 20 C.F.R. § 404.1574. Monticelli confirmed in her testimony that the last time she worked was 2000, for three months, as a fast food restaurant cashier. (R. 444.)

Monticelli also suffered from a "severe impairment" prior to November 18, 1999. Under the ALJ's analysis, the medical records revealed that "the claimant suffered a deep vein thrombosis at age 16 and was diagnosed with Factor V Leiden deficiency . . . As a result she was placed on long-term anticoagulation therapy that required continual monitoring of her blood clotting ability." (R. 17.) He went on to find that "[a]lthough the medical documentation prior to either the attainment of age 22 or the expiration of her disability insured status is, at best sparse, it does contain laboratory test results for March 1997 that show the claimant had elevated prothrombin times as the result of her anticoagulation therapy."

Medical records support this conclusion. Laboratory results from 1997 show elevated prothrombin times, (R. 229-35), and in 1999, Monticelli was diagnosed with Factor V Leiden deficiency. (R. 219.) Monticelli also suffered from deep vein insufficiency on July 12, 1999 and, although negative, underwent tests for a pulmonary embolus on August 31, 1999. (R. 209, 213.)

Although severe, Monticelli's impairments did not meet or equal the criteria set forth 20 C.F.R. Part 404, Subpart P, Appendix I (Listings). While not articulated by the ALJ, the most analogous listed impairment is Listing 4.11, which states:

> Chronic vein insufficiency of a lower extremity with incompetency or obstruction of the deep venous system and one of the following: (A) Extensive brawny edema involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip; or (B) Superficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment.

Nothing in the record suggests that Monticelli's impairments meet or equal the ailments mentioned in Listing 4.11.

The record also establishes that Monticelli had sufficient RFC to work at her past job as a fast food restaurant cashier as of November 18, 1999. The ALJ determined that

8

despite Monticelli's impairments her symptoms and manifestations lacked the persistence, intensity, and frequency to preclude her from performing work related activities.  (R 17.)

Although after the relevant time period, the medical records from Dr. Rosenbluth and Dr. Jennis from October 2000 to October 2002 provide support for the ALJ's RFC analysis.  The records show that blood thinners and regular visits to the doctor helped treat Monticelli's condition.  During this time period, Monticelli took a variety of blood thinners, specifically Lovenox, Coumadin, and Heparin, and visited Drs. Rosenbluth and Jennis regularly.  (R. 166-184.)  As a result of this treatment, the records consistently note that Monticelli was in normal physical condition and that she was "doing well."  (*Id.*)

The only evidence that could support Monticelli's claim that she lacked the requisite RFC prior to November 18, 1999 is the diagnosis of Dr. Schwartz.  Dr. Schwartz opined that, since 1995, Monticelli's hypercoagulable state, obesity, and tendency to clot, impeded her ability to perform certain activities, such as standing and walking for long periods of time.  (R. 162, 311.)

The ALJ, however, discredited Dr. Schwartz's opinion.  Outside of the fact that Dr. Schwartz treated her after the relevant time period and therefore lacked first hand knowledge, the ALJ found that his opinion contradicted the sparse findings reflected in the contemporaneous evidence.  (R. 19.)  As discussed above, the lengthy records from Dr. Rosenbluth and Dr. Jennis from October 2000 to October 2002 repeatedly indicate that Monticelli was doing well.  (R. 166-184.)  For these reasons, the ALJ properly rejected Dr. Schwartz's retrospective assessment of Monticelli's impairments.

Additionally, the ALJ properly discredited the findings of Dr. Plauka, who concluded in July 2003 that Monticelli was "mildly to moderately limited for prolonged standing and walking due to left leg pain."  (R. 296.)  Nothing in Dr. Plauka's report can be interpreted to relate to the time period prior to November 18, 1999.

As for Monticelli's representations, the ALJ was entitled to discredit her subjective complaints.  *See LaCorte v. Bowen*, 678 F. Supp. 80, 83 (D.N.J. 1988).  The ALJ considered Monticelli's medical concerns, but found that "these are not credible to any incapacitating extent for any time prior to either her date last insured, i.e., June 30, 1998, or the attainment of age 22, i.e., November 18, 1999."  No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairments that could reasonably be expected to produce the symptoms.  *See* SSR 96-7p.  Under this standard, Monticelli needed to show, through medical records or findings, that

9

she had a condition which reasonably could be expected to produce the alleged symptoms that are the cause of her inability to work prior to November 18, 1999.  Monticelli failed to meet this burden.

Based on Monticelli's RFC and in light of the discredited testimony of Drs. Schwartz and Plauka, the ALJ correctly determined that Monticelli's past relevant work as a cashier did not require the performance of work-related activities precluded by her RFC. In Monticelli's testimony, she stated that her work as a day care provider required the ability to sit, stand, and walk as needed.  (R. 444, 446.)  She also lifted children and toys, sometimes weighing as much as twenty pounds.  (R. 446.)  However, she stopped working as a day care provider in 1998, because "the babies were even getting too heavy."  (*Id.*) However, her job as a fast food restaurant cashier in 2000 did not require her to lift heavy objects, but instead only required standing and walking for long periods of time.  (R. 444.)

The ALJ acknowledged that "[s]ince the alleged onset date, the claimant has not retained the ability to perform the lifting required in her job as a day care worker," but went on to find that "her past work as cashier . . . did not require the performance of any functional activities that were precluded by her impairment."  (R. 19.)  The ALJ concluded that Monticelli's RFC was consistent with the demands and duties inherent in her past work and that the job as a cashier would not result in any form of bruising or cutting.  (R. 19-20.)

Since, during the relevant time period, Monticelli retained the RFC to perform her past relevant works as a cashier, the ALJ properly found that Monticelli was not disabled prior to the expiration of her disability insured status on June 30, 1998 or the attainment of age twenty-two on November 18, 1999.  (R. 19-20.)

**B.      Newly Submitted Evidence Insufficient for Remand**

Finally, the Court will not remand this matter for consideration of additional medical records.  Monticelli submitted additional medical records to the United States Attorney Office on July 9, 2008.  The additional records include pediatric medical records from Monticelli's April 1995 hospitalization for DVT as well as follow-up ob-gyn records from May and June 1995.

Under sentence six of § 405(g), a remand is warranted when new evidence becomes available, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).  To support a "new evidence" remand, the evidence must first be "new" and not merely cumulative of what is already in the record.  *Szuback v. Sec. of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984).  Second, the evidence must

be "material," meaning relevant and probative.  *Id.*  Beyond that, the materiality standard requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Commissioner's determination.  *Id.*

Here, the new evidence buttresses the ALJ's determination.  As stated in the decision, the ALJ found that prior to November 18, 1999, Monticelli suffered from Factor V Leiden deficiency, which resulted in DVT and subsequent treatment with various blood thinners.  (R. 18.)  These records simply confirm that Monticelli suffered from a DVT prior to her alleged date of disability and was diagnosed with Factor V Leiden mutation.  Since the additional records are cumulative of what is already in the record and can not be reasonably considered to have impacted the ALJ's decision, remand is not warranted.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.  An appropriate Order accompanies this Letter Opinion.

                                                      s/William J. Martini
                                                      **William J. Martini, U.S.D.J.**